**GENERAL ELECTRIC COMPANY,**
Defendant and Third-Party
Plaintiff, Appellant,

v.

**Kelly C. MORETZ, Plaintiff,**
and
**Mason & Dixon Lines, Inc., Third-Party**
Defendant, Appellees.

No. 7878.

United States Court of Appeals
Fourth Circuit.

Argued June 22, 1959.

Decided Sept. 16, 1959.

John H. Doughty, Knoxville, Tenn., and John H. Locke, Roanoke, Va. (Gentry, Locke & Rakes, Roanoke, Va., and Hodges, Doughty & Carson, Knoxville, Tenn., on the brief), for appellant.

A. Linwood Holton, Jr., Roanoke, Va. (Eggleston & Holton, Roanoke, Va., Todd & Todd, and Dodson & Dodson, Kingsport, Tenn., on the brief), for appellee Kelly C. Moretz.

John H. Thornton, Jr., Roanoke, Va., and Duke Duvall, Oklahoma City, Okl. (Woods, Rogers, Muse & Walker, Roanoke, Va., on the brief), for appellee Mason & Dixon Lines, Inc.

Arthur E. Smith and Evans B. Jessee, Roanoke, Va., on the brief for Liberty Mut. Ins. Co.

Before SOBELOFF, Chief Judge, SOPER, Circuit Judge, and THOMSEN, District Judge.

SOPER, Circuit Judge.

This suit was brought by Kelly C. Moretz against the General Electric Company for injuries suffered by him while driving a trailer truck in which heavy crated electric control panels and other electrical equipment belonging to General Electric had been negligently loaded. Moretz was an employee of The Mason & Dixon Lines, Inc., a common carrier, which owned the vehicle and undertook the transportation of the shipment. In the first instance, the cargo was placed in the trailer by employees of General Electric at its plant in Salem, Roanoke County, Virginia. It was loaded in such a fashion that an open space was left in the center of the trailer without bracing, allowing the cargo to shift in the course of the subsequent journey. In this condition the trailer was turned over to a pickup driver of Mason & Dixon, who delivered it without mishap to the Mason & Dixon terminal eight or nine miles away at Roanoke, Virginia. There the trailer was sealed and turned over to the plaintiff, an over-the-road driver of Mason & Dixon, to be driven to its ultimate destination in Alabama. No change was made in the disposition of the cargo, although Mason & Dixon had notice that it was improperly stowed. During the subsequent trip the load suddenly shifted as the vehicle rounded a turn in the road near Roanoke, causing the trailer to overturn and injure the driver; and this suit was brought to recover for his injuries.

After the institution of the suit, General Electric filed an answer in which it denied that it had been guilty of any negligence which caused the accident. With the leave of the court it also filed a third-party complaint against The Mason & Dixon Lines, wherein it alleged that the carrier had the duty to inspect the shipment and to decline it if it was improperly loaded and that its failure to perform these duties was the proximate cause of the accident; and that even if General Electric was guilty of negligence in loading the trailer improperly in the

first place, it was entitled to indemnity from the carrier for any damages recovered by the plaintiff since the fault of Mason & Dixon in transporting the goods, with notice of faulty stowage, was so grave as to throw the whole loss upon it.

In response to the third-party action, Mason & Dixon filed an answer, which in effect denied liability, and also moved the court for a separate trial of the issues raised by the plaintiff. In addition, Mason & Dixon moved the court to dismiss the third-party complaint on the ground that the plaintiff in the original suit had been paid compensation for his injuries under the Workmen's Compensation Act of Tennessee as an employee of Mason & Dixon and that under § 50–908 of the Tennessee Code the plaintiff's right to compensation was exclusive of all other rights and remedies against his employer. The court, however, declined to pass upon the motion to dismiss at that time and the case of the plaintiff against General Electric proceeded to trial before the jury in which all parties participated. Prior to the trial the judge announced that the case would be first submitted to the jury on the question of the primary negligence of General Electric and its liability to the plaintiff and that any action thereafter upon the third-party complaint would take the form of a special interrogatory to the jury in order to enable the court to determine the liability of the carrier to indemnify the shipper. Accordingly, the jury were instructed that their verdict must be confined to the issue of the liability of General Electric to the plaintiff and that Mason & Dixon was in the case because of the contention that it was liable to General Electric, but that the jury should not bring in any verdict in favor of the plaintiff against Mason & Dixon. The jury returned a verdict in favor of the plaintiff against General Electric in the sum of $35,000 and thereupon the District Court submitted a special interrogatory to the jury as to whether Mason & Dixon was guilty of negligence which proximately contributed to the accident and the resulting injuries to the plaintiff. The jury answered this interrogatory in the affirmative. The uncontradicted evidence in the case showed that Mason & Dixon transported the goods with knowledge that they were insecurely loaded.

Prior to the trial the Liberty Mutual Insurance Company filed a petition setting forth that it had insured Mason & Dixon against liability under the Workmen's Compensation Act of Tennessee and had paid certain benefits on behalf of the carrier to the plaintiff and it therefore claimed subrogation to the right of the carrier to recover the benefits that it had paid under the Act. After the jury retired to consider the verdict the Insurance Company proved that it had paid, under the statute, the amount of $1665.99 to the plaintiff and in the final judgment of the court it was ordered that the General Electric Company pay this sum to the Insurance Company out of the amount awarded to the plaintiff by the jury's verdict, less ten per cent which was ordered to be paid to plaintiff's attorneys for services rendered.

We consider first the contention of General Electric, that a motion for a directed verdict in its favor should have been granted because under the undisputed facts of the case the injuries were not caused by the negligence of General Electric but by the intervening independent negligence of Mason & Dixon and, second, because the plaintiff himself was guilty of contributory negligence. In respect to the first defense, reliance is placed upon the rule in Virginia, where the accident occurred, that if a second tort-feasor is aware or should be aware of a potential danger created by the negligence of an original tort-feasor and thereafter, by an independent act of negligence brings about an accident, the dangerous condition created by the first actor is regarded merely as an incident which is insulated by the independent wrongful act of the second actor, and the latter's negligence is regarded as the sole proximate cause of the accident. Thus, in Hubbard v. Murray, 173 Va.

448, 3 S.E.2d 397, a bus which had been carelessly parked on the highway in violation of the statute was struck in the rear, in broad daylight, by a carelessly driven truck which then careened across the road and killed an occupant of an oncoming car, and it was held that the driver of the truck was liable for the accident. See also Edgerton v. Norfolk Southern Bus Corp., 187 Va. 642, 47 S.E.2d 409.

The District Judge correctly held that this rule is not applicable in the pending case because there was no independent act of negligence but merely passive inaction on the part of Mason & Dixon in failing to correct the dangerous condition which General Electric had created. The general rule in such a situation is set forth in the Restatement of Torts as follows:

"§ 452. Failure of a third person to perform a duty owing to another to protect him from harm threatened by the actor's negligent conduct is not a superseding cause of the other's harm.

"Comment:

"a. * * * The third person's failure to perform his duty in this respect makes him concurrently liable with the negligent actor for any harm which results from the actor's negligence and which would have been prevented by the performance of the third person's duty." [1]

We had occasion to consider a similar question in Pierce v. Ford Motor Co., 4 Cir., 190 F.2d 910, where the negligence of the manufacturer in delivering a defective car to a dealer in Virginia led to an accident and the defense was that the car had been subsequently inspected by an employee of the dealer. In overruling the defense we said (190 F.2d at page 913):

"It is argued that any negligence of the manufacturer in turning out a defective car is insulated by that of a mechanic who inspects it afterwards so that the latter will be deemed the proximate cause of any injury resulting from its defective condition; but this argument is entirely without merit. As said in Harper on Torts, ch. 7 sec. 106, quoted in Foley v. Pittsburgh-Des Moines Co., 363 Pa. 1, 68 A.2d 517, 529: 'A negligent defendant cannot escape liability because of a failure on the part of some third person to perform an affirmative duty which, if properly performed, would have enabled the plaintiff to avoid the risk created by the defendant's negligence. The failure of the other to inspect adequately may make him liable to the party harmed, but it will not relieve the defendant whose negligence was responsible for the hazard in the first place.'

"As we pointed out in Atlantic Greyhound Corp. v. McDonald, 4 Cir., 125 F.2d 849, 852: 'It is well settled under the law of Virginia that "a cause, to be a superseding cause, must entirely supersede the operation of the negligence of the defendant, so that such cause alone, without the defendant's negligence contributing in the slightest degree thereto, in fact produced the injury."'" [2]

In the next place, General Electric contends that the plaintiff was guilty of contributory negligence because he did not inspect the fastening of the load and make sure that it was securely in

---

[1]. The Virginia authorities are in accord with this rule. Clinchfield Coal Corp. v. Ray, 1917, 121 Va. 318, 93 S.E. 601; Chesapeake & O. R. Co. v. Crum, 1924, 140 Va. 333, 125 S.E. 301; Scott v. Simms, 1949, 188 Va. 808, 51 S.E.2d 250.

[2]. For the reasons given above, the judge correctly refused a charge requested by General Electric in the pending case that even if it was guilty of prior neglect the verdict should be in its favor if the jury found that Mason & Dixon saw or should have seen the defect and danger and had an opportunity to correct it but failed to do so.

place before he started on his drive to Alabama. The Interstate Commerce Commission, acting under the authority of 49 U.S.C.A. § 304, has promulgated certain rules and regulations regarding the transportation of property by motor carrier. These regulations provide amongst other things that "no motor vehicle shall be driven unless the driver thereof shall have satisfied himself that the tailboard or tailgate, tarpaulins, spare tires, and all means of fastening the load are securely in place," 49 C.F.R. 193.9(b). The gist of the contention is that the plaintiff did not make the inspection required by these regulations before starting out on the trip. He had nothing to do originally with the loading of the vehicle at the General Electric plant or with the inspection of it after it was delivered by the pickup driver to the terminal of the carrier at Roanoke. The latter driver reported to the officials in charge at the terminal that the load had not been braced, but no change in its disposition was made. Before the vehicle was turned over to the plaintiff to be driven to its ultimate destination, the doors were sealed and it was covered by tarpaulin secured to the sides of the vehicle, so that he could not see or inspect the load before he started out without breaking the seal; and he had no authority to do this under the rules of his employer. He did, however, inspect the tires, the lights, and the fastenings of the trailer to see if they were secure, and checked to see if the doors were properly fastened, and found all of these items in good shape.

No specific instructions to the jury on this point were requested by the defendant, but the contention is that the request for a directed verdict should have been granted because the driver did not satisfy himself that the load was securely fastened as required by the regulations. In our opinion, under the circumstances related, the motion for a directed verdict on this point was properly refused. Undoubtedly it was the duty of the driver to make the required inspection and had he failed to do so he might well have been charged with contributory negligence for violation of a regulation designed for the protection of the public; but we cannot say that it was his duty to disobey the rules of his employer and break the seal which had been placed on the doors of the truck before it was put in his charge. There was evidence from which the jury might find that it was not unreasonable on his part to infer from the sealing of the doors of the truck that the load had been properly secured by the agents of the carrier and thus satisfy himself that the cargo was ready for carriage over the public highway. In this connection, the judge charged the jury that the evidence showed that the plaintiff had no knowledge of the manner in which the cargo was loaded as the trailer had been sealed before it was turned over to him, and that the knowledge of the other employees of the carrier of the manner in which the cargo was loaded was not to be imputed to him since he himself had no knowledge of the manner in which it had been stowed. At the conclusion of the charge the attorneys for both sides, in response to an inquiry of the court, stated that they had no objections to urge.

We conclude that there was substantial evidence to support the verdict against General Electric and we come to its alternate contention that even if its careless loading of the cargo contributed to the accident, it is nevertheless entitled to indemnity from Mason & Dixon, the carrier, because of the latter's failure to secure the load safely before sending it on the road. This neglect on the carrier's part was clearly established by the uncontradicted evidence and by the answer of the jury to the special interrogatory submitted to them after they had found their verdict in favor of the plaintiff against General Electric. The question of indemnity came before the court on the motion of General Electric to set aside the verdict and enter judgment in its favor or, in the alternative, to enter judgment in its favor against Mason & Dixon for the

amount of the verdict on the ground that Mason & Dixon as the carrier of the goods was the principal offender.

The judge overruled this motion. He was of the opinion that General Electric was not entitled to the right of indemnity against Mason & Dixon unless it could be found in the contractual relationship between them, and he held that the contract gave General Electric no such right. The bill of lading covering the shipment was issued under a published tariff of Southern Motors Carriers, filed with the Interstate Commerce Commission and the Virginia Corporation Commission, which provided in Rule 21 that an article weighing 500-pounds or more or exceeding 8-feet in its greatest dimension and 4-feet in each intermediate dimension should be loaded by the shipper.[3] Since General Electric, in obedience to Rule 21, undertook

the performance of this duty but performed it so carelessly that the driver was injured, the judge held that it could not now demand indemnity from the carrier. These provisions of the tariff relating to the shipper, however, tell only a part of the story. Regulations issued by the Interstate Commerce Commission, under the authority of 49 U.S.C.A. § 304, impose specific duties upon the carrier of the cargo. They provide that no motor carrier shall permit any motor vehicle to be driven if the load thereon is so improperly distributed or so inadequately secured as to prevent its safe operation; and that the load shall be properly distributed, and if necessary secured, in order to prevent unsafe shifting of the load or unsafe operation of the vehicle. See 49 C.F.R. 192.9(a), (b) and 193.9(a), (b).[4] These regulations were not overlooked in the decision below but it was

3. "Rule 21. *Heavy or Bulky Articles, Loading or Unloading*. Sec. 1. Where an article (or articles) in a single container or shipping form tendered, weighs 500 lbs. or more, or if the greatest dimension exceeds 8 feet or greater and intermediate dimension each exceeds 4 feet, loading or unloading shall be performed by the shipper or consignee, as the case may be. If requested, carriers will undertake, in behalf of the shipper or consignee, as the case may be, to employ additional help. No charge will be made for labor performed by the truck driver, but a charge of one dollar and fifty cents ($1.50) per hour or fraction thereof, for each man furnished, other than the truck driver, shall apply from time vehicle arrives at the place of pickup or delivery until shipment is loaded or unloaded, as the case may be.

"Exception—The provisions of Sec. 1 will not apply if such article (or articles), weighing less than 500 pounds:

"(a) exceeds 8 feet but does not exceed 22 feet in its greatest dimension and does not exceed 2 feet in any other dimension, or

"(b) if it does not exceed 10 feet in its greatest dimension and does not exceed 5 feet in its intermediate dimension and does not exceed 1 foot in its least dimension.

"Rule 22. *Dunnage or Temporary Blocking, Racks, Standards, Supports, etc.* Any temporary blocking, flooring or lining racks, standards, strips, stakes,

or similar bracing, dunnage or supports not constituting a part of the vehicle when required to protect and make shipments subject to other than LTL or AQ ratings or rates secured for transportation must be furnished and installed by the shipper, except that such materials as may be furnished by the shipper will be installed by the carrier at a charge for labor necessary for such installation at the rate of one dollar and fifty cents ($1.50) per hour or fraction thereof, for each man. When materials are furnished by the carrier, charge therefor will be as per tariffs lawfully on file with the Interstate Commerce Commission or State regulatory body having jurisdiction."

4. 49 C.F.R. 192.9 "(a) *Distribution and securing of load.* No motor vehicle shall be driven nor shall any motor carrier permit or require any motor vehicle to be driven if it is so loaded, or if the load thereon is so improperly distributed or so inadequately secured, as to prevent its safe operation.

"(b) *Doors, tarpaulins, tailgates, and other equipment.* No motor vehicle shall be driven unless the tailgate, tailboard, tarpaulins, doors, all equipment and rigging used in the operation of said vehicle, and all means of fastening the load, are securely in place."

49 C.F.R. 193.9 "(a) *Distribution and securing of load.* The load on every motor vehicle transporting property shall be properly distributed, and if necessary, secured, in order to prevent unsafe shift-

thought that they merely imposed a duty upon the carrier to protect the general public and did not form a part of the contract between the shipper and the carrier; and since the plaintiff was not a member of the general public—but an employee of Mason & Dixon—his rights as to his employer were fixed by the Workmen's Compensation Act of Tennessee.

In addition to these regulatory provisions, obligations were imposed upon the carrier by 49 U.S.C.A. § 20(11), which is made applicable to motor carriers by 49 U.S.C.A. § 319. This provides that any common carrier receiving property for interstate transportation shall issue a bill of lading therefor and shall be liable to the holder for any loss, damage or injury to the property caused by it and that no contract shall exempt the carrier from the liability imposed.

 In our opinion the provisions of the statutes and regulations referred to as well as the provisions of the tariff formed part of the contract between the shipper and the carrier in this case. In Virginia, where the contract was made, and generally in other jurisdictions throughout the country, it is settled that relevant statutes and regulations existing at the time a contract is made become a part of it and must be read into it just as if they were expressly referred to or incorporated in its terms.[5] Hence it is plain that Mason & Dixon assumed the direct and specific obligation to General Electric to secure the cargo safely so that it would not shift during the movement, and became liable for any loss caused by its failure to carry out its promises, unless it is excused by the concurring negligence of General Electric. It should be borne in mind, in this connection, that the transportation of the goods during which the loss occurred lay entirely in the hands of the carrier and that the initial failure of the shipper to load the goods properly in no way prevented the carrier from carrying out its own statutory contractual duties. Moreover, the requirement of the tariff that the shipper bear the burden of loading heavy or bulky goods was obviously inserted as part of the consideration moving from the shipper for the carriage of the goods at the published rate. It was not intended to shift to the shipper a duty ordinarily imposed upon the carrier. This becomes the more clear from the provision of the tariff that the carrier itself might do the work upon payment by the shipper of the expense involved. Clearly the carrier was not excused from carrying out its primary obligation to the shipper to make certain that the cargo delivered to it unharmed was not sent out over the public roads in a dangerous condition.

Bearing these circumstances in mind, the claim of the shipper to be indemnified for the loss caused by the carrier's de-

ing of the load or unsafe operation of the vehicle.

"(b) *Fastenings secure.* No motor vehicle shall be driven unless the driver thereof shall have satisfied himself that the tailboard or tailgate, tarpaulins, spare tires, and all means of fastening the load are securely in place."

5. As to the inclusion of public tariffs and classifications in the contract between shipper and carrier, see Louisville & N. R. Co. v. Chatters, 1929, 279 U.S. 320, 331, 49 S.Ct. 329, 73 L.Ed. 711, 719; Eastern Motor Express, Inc. v. A. Maschmeijer, Jr., Inc., 2 Cir., 1957, 247 F. 2d 826, 828, 65 A.L.R.2d 765; Fawley Motor Lines, Inc. v. Cavalier Poultry Corp., 4 Cir., 1956, 235 F.2d 416, 419; Loveless Mfg. Co. v. Roadway Exp., D.C. Okl.1952, 104 F.Supp. 809, 812.

As to the inclusion in the contract of regulations of the Interstate Commerce Commission, see Atchison, T. & S. F. Ry. Co. v. Scarlett, 1937, 300 U.S. 471, 474, 57 S.Ct. 541, 81 L.Ed. 748.

As to the general rule in Virginia and in the Federal courts, see Maxey v. American Cas. Co. of Reading, Pa., 1942, 180 Va. 285, 290, 23 S.E.2d 221; Merchants' Bank of Danville v. Ballou, 1899, 98 Va. 112, 119, 32 S.E. 481, 44 L.R.A. 306; Union Central Life Ins. Co. v. Pollard, 1896, 94 Va. 146, 153, 26 S.E. 421; Northern Pacific R. Co. v. Wall, 1916, 241 U.S. 87, 91–92, 36 S.Ct. 493, 60 L.Ed. 905; East Texas Motor Freight Lines v. United States, 5 Cir., 239 F.2d 417, 418; 12 Am.Jur., Contracts, § 240, p. 769.

fault takes on a different aspect. The Federal courts on a number of occasions have given consideration to a similar question in the analogous situation of a shipowner who has been called upon to pay damages to a longshoreman for injuries received in the negligent performance by the stevedoring company, his employer, of its contract for the loading or unloading of the vessel. Liability of the stevedoring company to the longshoreman was limited to compensation under the Longshoremen's and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq. while liability of the shipowner was based on the unseaworthy condition of the ship or some act of negligence on the part of the shipowner in furnishing unsafe equipment or a safe place to work. In these cases the question has arisen as to whether the default of the shipowner deprived him of the right to be indemnified by the stevedoring company because of its failure to comply with its contract. Thus, in Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, a stevedoring company was under contract with a shipowner to perform all the stevedoring operations required by the shipowner in its coastwise service; and the shipowner was held liable to a longshoreman for injuries suffered by him while unloading the ship at Brooklyn, New York, which were caused by the unsafe stowage of the cargo at an earlier port by the stevedoring contractor under the supervision of the officers of the ship who had authority to reject unsafe stowage; but it was held that the shipowner, notwithstanding its participation in the unsafe stowage, was entitled to indemnity from the stevedoring contractor. This conclusion was reached although there was no express agreement of indemnity. The Court said (350 U.S. at pages 133, 134, 76 S.Ct. at page 237):

"The shipowner here holds petitioner's uncontroverted agreement to perform all of the shipowner's stevedoring operations at the time and place where the cargo in question was loaded. That agreement necessarily includes petitioner's obligation not only to stow the pulp rolls, but to stow them properly and safely. Competency and safety of stowage are inescapable elements of the service undertaken. This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured product. The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service.

\* \* \* \* \* \*

"Petitioner suggests that, because the shipowner had an obligation to supervise the stowage and had a right to reject unsafe stowage of the cargo and did not do so, it now should be barred from recovery from the stevedoring contractor of any damage caused by that contractor's uncorrected failure to stow the rolls 'in a reasonably safe manner.' Accepting the facts and obligations as above stated, the shipowner's present claim against the contractor should not thereby be defeated. Whatever may have been the respective obligations of the stevedoring contractor and of the shipowner to the injured longshoreman for proper stowage of the cargo, it is clear that, as between themselves, the contractor, as the warrantor of its own services, cannot use the shipowner's failure to discover and correct the contractor's own breach of warranty as a defense. Respondent's failure to discover and correct petitioner's own breach of contract cannot here excuse that breach."

This holding was approved and followed in Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, where a longshoreman recovered damages from the

shipowner for injuries caused by the fall of timber from an insecure structure on the deck of the ship, and it was held that the careless maintenance of the structure on the part of the ship did not preclude the submission to the jury of its claim to indemnity from the stevedoring contractor based on the latter's careless use of the structure in the unloading operation. It was pointed out (355 U.S. at page 568, 78 S.Ct. at page 441) that the duties owing by the shipowner to the longshoreman were not identical with those owed by the shipowner to the stevedoring contractor. Again, in Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed. 2d 413, indemnity was allowed a shipowner against a stevedoring contractor where injuries were caused by unsafe equipment furnished by the ship and used by the contractor. We applied the same rule in our decisions in Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79, and in American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82, in both of which it was held that a shipowner was liable to an injured longshoreman for injuries suffered in the use of unseaworthy equipment furnished by the ship, but that the shipowner was nevertheless entitled to indemnity from the stevedoring contractor because the latter negligently used the equipment in the performance

of its contract.[6] It is plain that the default of the shipper in the pending case was no greater than that of the shipowner in the cited cases.

 We reach the conclusion that the contract of Mason & Dixon for the carriage of the goods embraced the liability to indemnify General Electric in case it suffered loss occasioned by the neglect of the carrier; and there remains only for consideration the additional contention of Mason & Dixon that the application of that rule is barred in the pending case by the Workmen's Compensation Act of Tennessee (Tennessee Code § 50–908), which provides that the rights and remedies granted to an employer thereunder on account of personal injury for accidents shall exclude all other rights and remedies of the employee at common law or otherwise on account of such injury. Our attention is called to a number of cases in which somewhat similar language of the workmen's compensation act of a state has been held a bar to a suit against an employer for indemnity by a third person who has been required to pay damages for injuries to an employee, although the injuries were caused primarily by the neglect of the employer and only secondarily by negligence of a third person.[7] Thus, in Hunsucker v. High Point Bending & Chair Co., 1953, 237 N.C. 559, 75 S.E.2d 768, where the authorities

6. Prior to the development of the theory in these cases that an agreement to indemnify is of the essence of a contract in which one undertakes to perform services for another, it had been held in this and other courts that when one who is secondarily liable is called in to respond in damages to an injured party he may recover the amount paid from the person primarily liable. See our decision in United States v. Savage Truck Line, Inc., 4 Cir., 1953, 209 F.2d 442, 44 A.L.R.2d 984 where, under circumstances very similar to those in the case at bar, we held that in a motor carrier contract the primary contractual duty as to safe loading is upon the carrier and that the failure to perform the duty is a weighty factor in identifying the principal offender and saddling him with the liability of indemnitor, notwithstanding the initial negligence of the shipper in loading the

goods of which the carrier had notice. See also American District Telegraph Co. v. Kittleson, 8 Cir., 1950, 179 F.2d 946, 952; Orlove v. Philippine Air Lines, Inc., 2 Cir., 1958, 257 F.2d 384, 388, certiorari denied Flying Tiger Line, Inc. v. Philippine Air Lines, Inc., 358 U.S. 909, 79 S. Ct. 230, 3 L.Ed.2d 230; Hunsucker v. High Point Bending & Chair Co., 1953, 237 N.C. 559, 75 S.E.2d 768. In Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, at page 569, 78 S.Ct. 438, at page 442, 2 L.Ed.2d 491, it was pointed out that, in the area of contractual indemnity, an application of the theories of active or passive as well as primary or secondary negligence is inappropriate.

7. See Note, 42 Va.L.R. 959, Contribution and Indemnity: The Effect of Workmen's Compensation Acts. (1956).

**790**

were carefully reviewed, it was held that the Workmen's Compensation Act of North Carolina, G.S. § 97–1 et seq. abrogated both the statutory right of a negligent third party to claim contribution from a negligent employer in equal fault and the common-law right of a passively negligent third party to demand indemnity from an actively negligent employer. See also Public Service Electric & Gas Co. v. Waldroup, 1955, 38 N.J.Super. 419, 119 A.2d 172, and Slattery v. Marra Bros., 2 Cir., 1951, 186 F.2d 134, 139, where the same conclusion was reached in respect to the Workmen's Compensation Act of New Jersey, N.J.S.A. 34:15–1 et seq.; Peak Drilling Co. v. Halliburton Oil Well Cementing Co., 10 Cir., 1954, 215 F.2d 368, construing the law of Oklahoma; Crawford v. Pope & Talbot, Inc., 3 Cir., 1953, 206 F.2d 784, with respect to the Longshoremen's and Harbor Workers' Compensation Act. It is noticeable, however, that in all of these cases upon which Mason & Dixon relies in the pending suit the courts were careful to point out that the compensation act in question did not bar indemnity when there existed a contractual relationship between the parties whose negligence combined to cause the employee's injuries. Thus it was pointed out in Hunsucker v. High Point Bending & Chair Co., 1953, 237 N.C. 559, at pages 567 and 568, 75 S.E.2d 768, that in the cases in which indemnity to third parties was allowed, the negligent employer was under express contract with the third party or bore some special relationship to him other than that arising out of participation in the joint wrong to the injured employee. This distinction was noted also in Public Service Electric & Gas Co. v. Waldroup, 38 N.J.Super. 419, 119 A.2d 172, at page 181, and Slattery v. Marra Bros., 2 Cir., 1951, 186 F.2d at page 139, and Peak Drilling Co. v. Halliburton Oil Well Cementing Co., 10 Cir., 1954, 215 F.2d at page 371, and in Crawford v. Pope & Talbot, Inc., 3 Cir., 1953, 206 F.2d 784, at page 792.

This distinction was the foundation of the holding in Ryan Stevedoring Co. v.

Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, from which we have quoted at length, that § 5 of the Longshoremen's and Harbor Workers' Act does not preclude the assertion by the shipowner of the stevedore's contractual liability to him, although the stevedore is the employer of the injured worker. It was pointed out (350 U.S. at page 130, 76 S.Ct. at page 235) that although the Longshoremen's and Harbor Workers' Act protects employers from the claims of employees and those claiming under them, it nowhere excludes the right of a third person to insure himself against liability to the employee either by a bond of indemnity or by an agreement of the employer to save him harmless, which is the essence of a contract wherein one undertakes to perform services for another. In that case the stevedoring contractor for the loading of the vessel was held to embrace such a warranty. In the pending case the agreement of the carrier to see that the equipment was properly loaded before transporting it likewise involved an agreement to indemnify the shipper in case of loss. Similar conclusions had been reached by the courts in cases prior to Ryan. See Burris v. American Chicle Co., 2 Cir., 1941, 120 F.2d 218; Rich v. United States, 2 Cir., 1949, 177 F.2d 688; Crawford v. Pope & Talbot, Inc., 3 Cir., 1953, 206 F.2d 784, 792; Westchester Lighting Co. v. Westchester County Small Estates Corp., 1938, 278 N.Y. 175, 15 N.E.2d 567; Whitmarsh v. Durastone Co., D.C.R.I.1954, 122 F.Supp. 806.

Much reliance was placed in the trial court in the pending case on the decision of Trammell v. Appalachian Elec. Cooperative, D.C.E.D.Tenn.1955, 135 F.Supp. 512, which was described as the only case interpreting the exclusive liability section of the Tennessee Workmen's Compensation Act. In that case the question now under consideration was broached but not decided. The case involved an action by the administrator of a deceased employee against the Cooperative on account of the death of the

employee of a contractor who had agreed to undertake certain operations on behalf of the Cooperative. A third-party action was filed by the Cooperative against the contractor for indemnity but this was dismissed by the court on the ground that the third-party action would lie only if it was based upon contract, the court finding that no such contract existed between the parties. We are told that the Trammell decision was followed in another unreported case in the United States District Court for the Eastern District of Tennessee which is now on appeal. But it does not appear that in either of these cases the court decided what was described in Trammell as the more interesting question—whether in Tennessee an employer may assume liability to indemnify a third person who has injured an employee covered by the compensation act of the state. Furthermore, Trammell was decided before Ryan. We have no reason therefore to suppose that Tennessee will not follow the rule so well established in other jurisdictions which allows indemnity in cases of contract between the employer and the third person; and we do not reach the constitutional question whether the workmen's compensation act of a state may be so construed as to nullify or modify the obligations of a common carrier to a shipper which have been assumed in accordance with acts of Congress passed under the commerce clause of the Federal Constitution, Const. art. 1, § 8, cl. 3.

The judgment of the District Court is accordingly reversed insofar as it dismisses the third-party action of General Electric against Mason & Dixon and the case is remanded with directions to enter a judgment against Mason & Dixon in favor of General Electric for the amount of the judgment entered against General Electric in accordance with jury's verdict. In other respects, the judgment of the District Court is affirmed.

Reversed in part, affirmed in part, and remanded.